**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE PATUXENT RIVERKEEPER | * | |
| 18600 Queen Anne Road | | |
| Rear Barn | * | |
| Upper Marlboro, MD 20774 | | |
| | * | |
| Plaintiff, | | |
| | * | CIVIL ACTION NO. _____ |
| v. | | |
| | * | |
| THE UNITED STATES ARMY CORPS | | |
| OF ENGINEERS and LIEUTENANT | * | |
| GENERAL ROBERT L. "VAN" | | |
| ANTWERP IN HIS OFFICIAL | * | |
| CAPACITY AS U.S. ARMY CHIEF OF | | |
| ENGINEERS AND COMMANDING | * | |
| GENERAL OF THE U.S. ARMY | | |
| CORPS OF ENGINEERS (USACE) | * | |
| 441 G. Street, NW | | |
| Washington, DC 20314-1000 | * | |
| | | |
| and | * | |
| | | |
| JOHN MCHUGH IN | * | |
| HIS OFFICIAL CAPACITY AS | | |
| SECRETARY OF THE ARMY | * | |
| 1400 Defense Pentagon | | |
| Washington DC 20301-1400 | * | |
| | | |
| and | * | |
| | | |
| THE UNITED STATES | * | |
| ENVIRONMENTAL PROTECTION | | |
| AGENCY ("EPA") and LISA JACKSON | * | |
| IN HER CAPACITY AS | | |
| ADMINISTRATOR OF THE EPA | * | |
| 1200 Pennsylvania Avenue, N.W. | | |
| Washington, DC 20460 | * | |
| | | |
| Defendants. | * | |

For all Defendants, Serve On:            *

    Eric H. Holder, Jr.                   *
    United States Attorney General
    U.S. Department of Justice           *
    950 Pennsylvania Avenue, NW
    Washington, DC 20530-0001            *

    and                                  *

    Rod J. Rosenstein                    *
    United States Attorney for the
    District of Maryland                 *
    36 South Charles Street
    Baltimore, MD 21201-2693             *

   *    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

The Patuxent Riverkeeper ("Riverkeeper"), a non-profit watershed advocacy organization, by and through its attorney, G. Macy Nelson, brings this action for declaratory and injunctive relief, and for judicial review of the United States Army Corps of Engineers' ("Corps") final decision to verify that the proposed Woodmore Towne Center development meets the conditions and requirements of the Maryland State Programmatic General Permit-3 (MDSPGP-3).

## INTRODUCTION

1.    In this case, Plaintiff Riverkeeper challenges the Corps' final decision to verify that the Woodmore Town Center development, a commercial development to be located on a 244.67-acre parcel at the interchange of I-495 and Landover Road in Prince George's County, Maryland ("Subject Property"), complies with the requirements and conditions to obtain a

Maryland State Programmatic General Permit-3 (MDSPGP-3).  Under the MDSPGP-3 program

in Maryland, Corps verification is necessary before an applicant can obtain a State permit to

conduct activities that may impact waters of the United States, including wetlands.

2.      Subsequent to the Corps' MDSPGP-3 verification for the Woodmore Towne

Center application in this case, the Maryland Department of the Environment ("MDE") approved

Wetlands Permit Application Number 07-NT-0153/20076219 ("Application") and issued a

wetlands permit ("Permit") to the applicant, Petrie/Elg Inglewood, LLC ("Applicant"), on March

19, 2010.  The Applicant requires this wetlands permit so that it can begin work on the

aforementioned Woodmore Towne Center development on the Subject Property.  The

Woodmore Towne Center, as currently approved, will permanently impact 33,407 square feet of

forested nontidal wetlands, will temporarily impact 1,350 square feet of nontidal wetlands, will

permanently impact 3,660 square feet of existing streams, and will temporarily impact 845

square feet of existing streams.  In total, the Woodmore Towne Center project will impact 39,262

square feet of waters of the United States.

3.      Plaintiff Riverkeeper now asserts that the Corps' decision to verify the

Woodmore Towne Center application under the MDSPGP-3 was arbitrary and capricious and not

in accordance with the applicable laws and regulations.  Plaintiff Riverkeeper argues that the

Corps has not adequately articulated its reasons or explained its conclusions in verifying the

Application in this case.  For this reason, Plaintiff Riverkeeper seeks declaratory judgment and

injunctive relief to reverse or, in the alternative, vacate and remand the Corps' final decision to

verify the Woodmore Towne Center application as in compliance with the standards and requirements of the MDSPGP-3 permit in this case.

## JURISDICTION AND VENUE

4.       This Court has subject matter jurisdiction to hear this case pursuant to 28 U.S.C. Section 1331 and 2201.  This action presents a case and controversy under the Clean Water Act ("CWA"), 33 U.S.C. Sections 1251 *et seq*.  Plaintiff Riverkeeper seeks judicial review of the Corps' final agency action pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. Sections 701–706.

5.       Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(e).  Plaintiff Riverkeeper brings this action against the Corps, EPA, and officers of both agencies in their official capacities, for judicial review of an agency action that verified that the Woodmore Town Center Application in this case complies with the various requirements and guidelines to obtain an MDSPGP-3 permit.  The Woodmore Towne Center application verified by the Corps in this case concerns a proposed commercial development to be located in Prince George's County, Maryland.

## PARTIES

6.       In bringing this action, Plaintiff Riverkeeper sues the Corps as well as the Environmental Protection Agency ("EPA"), Lieutenant General Robert L. "Van" Antwerp in his official capacity as United States Army Chief of Engineers and Commanding General of the United States Army Corps of Engineers (USACE), Jim McHugh in his official capacity as Secretary of the Army, and Lisa Jackson in her official capacity as Administrator of the EPA.

4

7.      Plaintiff, the Patuxent Riverkeeper, is a nonprofit watershed advocacy organization affiliated with the Waterkeeper Alliance in New York, an umbrella group that licenses and links Waterkeepers internationally. The sole purpose of the Patuxent Riverkeeper is to protect, restore, and advocate for clean water in the Patuxent River and its connected ecosystem.  The Patuxent Riverkeeper patrols the river, investigates and resolves water quality and pollution complaints, launches and manages restoration projects, raises awareness about the river and its problems and works toward better enforcement of current laws and better laws to protect the river.  The Patuxent River drainage area covers 930 square miles overall and runs north to south for 110 linear miles through seven Maryland counties, terminating at the Chesapeake Bay.  The Patuxent is the longest and deepest intrastate river in Maryland, ranging from ankle wading depths, down to more than 180 feet.

8.      Defendant EPA, and more specifically, Lisa Jackson, Administrator of the EPA, is tasked with administering the CWA, 33 U.S.C. Sections 1251 *et seq*.

9.      Defendant Corps, and more specifically, John McHugh, Secretary of the Army, acting through Lieutenant General Robert L. "Van" Antwerp, United States Army Chief of Engineers and Commanding General of the United States Army Corps of Engineers (USACE), is tasked with issuing individual and general permits for discharges into waters of the United States, including wetlands, pursuant to 33 U.S.C. Section 1344.  Upon issuing such a general permit, the Chief of Engineers must verify whether individual activities comply with the various requirements of the general permit.  33. U.S.C. Section 1344(e).

## REGULATORY FRAMEWORK

10.     The objective of the CWA, 33 U.S.C. Sections 1251 *et seq.*, is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

11.     Section 301 of the CWA, 33 U.S.C. Section 1311, prohibits discharges of any pollutant into the waters of the United States by any person without a permit.

12.     Section 404 of the CWA, 33 U.S.C. Section 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits for the discharge of dredged or fill material into the waters of the United States, including wetlands.

13.     In addition to authorizing individual permits, Section 404 of the CWA also allows the Secretary of the Army, acting through the Chief of Engineers, to issue general permits on a State, regional, or nation-wide basis if the Secretary determines that "the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e).

14.     Pursuant to 33 U.S.C. Section 1344(e), the Corps issued the Maryland State Programmatic General Permit-3 (MDSPGP-3) on October 1, 2006.  This general permit is effective for five years, and expires on September 30, 2011.  33 U.S.C. § 1344(e)(2).

15.     The MDSPGP-3 is "designed to improve the regulatory process for applicants, reduce unnecessary duplicative project evaluations, and promote more effective and efficient use

of Corps resources while providing equivalent environmental protection for aquatic resources."

MDSPGP-3 at 2.

16.    The MDSPGP-3 applies generally to the following types of activities:

> This programmatic general permit applies to the discharge of dredged or
> fill material and/or the placement of structures, that are components of a
> single and complete project, including all attendant features both
> temporary and/or permanent, which individually and/or cumulatively
> result in direct or indirect impacts not to exceed 1.0 acre of waters of the
> United States, including jurisdictional wetlands and navigable waters, for
> specific categories of activities as regulated by Section 404 of the CWA or
> Section 10 of the River and Harbors Act of 1899.

MDSPGP-3 at 3.

17.    Upon receiving an application for a project that will have impacts on waters of the

United States, the Corps will designate the application as a Category I, II, or III project based on

the amount of proposed impacts of the project, and will review the application under the

applicable requirements of the MDSPGP-3.  If the Corps verifies that the project satisfies the

applicable provisions of the MDSPGP-3, the Corps will notify the applicant and the State, and

the applicant will then need to obtain further State and local authorizations before the project can

go forward.  MDSPGP-3 at 4–9.

18.    Section VI of the MDSPGP-3 is entitled "General Conditions," and states that

"[t]o qualify for MDSPGP-3 authorization, the prospective permittee must comply with the

following general conditions, as appropriate, in addition to any activity-specific conditions in the

MDSPGP-3 category list and any case-specific special conditions imposed by the Corps."

MDSPGP-3 at 39.

19.     In Section VI, one of these "general requirements" states that "[p]rojects authorized by the MDSPGP-3 shall have no more than minimal individual and cumulative adverse environmental effects."  MDSPGP-3 at 39.

20.     Section VI also includes a subsection titled "Minimization of Environmental Impacts," which states that "[d]ischarges of dredged or fill material into waters of the United States and adverse impacts of such discharges on the aquatic ecosystem shall be avoided and minimized to the maximum extent practicable onsite."  MDSPGP-3 at 42.

21.     Section VI includes a provision for mitigation as well, and states that "[g]enerally, compensatory mitigation will be required for all permanent tidal or nontidal wetland impacts either through the State's tidal or nontidal wetland compensation fund or by the permittee as required by special condition of the MDSPGP-3 or the State authorization."  MDSPGP-3 at 42.

22.     The Corps' regulatory guidance explains that mitigation should generally be located in the same watershed as the impacts to waters of the United States:

> In general, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses.

33 C.F.R. § 332.3(b)(1).

23.     The Corps' Regulatory Guidance Letter 02-02, applicable to the Application in this case since it was submitted in 2007, before the new 2008 mitigation guidelines went into effect, further states that the Corps prefers mitigation projects that are on-site with the proposed

project, but if it is necessary to locate a mitigation project off-site, it should be located either in

the same watershed, or in close geographical proximity to the proposed impacts to waters of the

United States:

> Mitigation should be required, when practicable, in areas adjacent or contiguous to the discharge site (on-site compensatory mitigation).  On-site mitigation generally compensates for locally important functions, e.g., local flood control functions or unusual wildlife habitat.  However, off-site mitigation may be used when there is no practicable opportunity for on-site mitigation, or when off-site mitigation provides more watershed benefit than on-site mitigation, e.g., is of greater ecological importance to the region of impact.  Off-site mitigation will be in the same geographic area, i.e., in close proximity to the authorized impacts and, to the extent practicable, in the same watershed.  In choosing between on-site or off-site compensatory mitigation, Districts will consider: 1) likelihood for success; 2) ecological sustainability; 3) practicability of long-term monitoring and maintenance or operation and maintenance; and, 4) relative costs of mitigation alternatives.

Corps of Engineers RGL 02-2, December 24, 2002 at 5.

24.     For projects that include impacts on wetlands, the Corps' Regulatory Guidance

Letter 02-02 states that the agency prefers in-kind mitigation rather than out-of-kind mitigation,

and that "[i]n-kind replacement for a wetland loss involves a replacement of a wetland area by

establishing, restoring, enhancing, or protecting and maintaining a wetland area of the same

physical and functional type.  In-kind replacement generally is required when the impacted

resource is locally important." *Id.*

**FACTS**

25.     On April 20, 2007, Petrie/ELG Inglewood, LLC ("Applicant") submitted an

Application to MDE and to the Corps for a Nontidal Wetlands and Waterways Permit to develop

the Woodmore Towne Center.

26.     The Application stated that a nontidal wetlands permit was needed for the

proposed Woodmore Towne Center at Glenarden project, an approximately 245-acre residential

and commercial private development that would result in 12,086 square feet of permanent

nontidal wetlands impacts and 21,509 square feet of temporary nontidal wetlands impacts.  The

Application further indicated that the development would permanently impact 77 linear feet and

temporarily impact 389 linear feet of streams/waters.  Finally, the Application stated that the

development would result in 3,964 square feet of permanent impacts and 2,371 square feet of

temporary impacts to nontidal wetlands buffers.  As of the April 20, 2007 Application, the total

permanent and temporary impacts to waters of the United States from the Woodmore Towne

Center development was 0.97 acres, or 42,377 square feet.

27.     On October 14, 2008, the Applicant submitted a revised application package to

MDE.  In this revised application, the Applicant indicated that each of the above impacts in the

original Application had increased.  The revised application indicated that the development

would result in a total of 36,285 square feet of impacts to wetlands, 25,798 square feet of impacts

to nontidal wetlands buffers, and 593 linear feet of impacts to streams.

28.     The Applicant again revised the impact totals on several instances, at times apparently exceeding the maximum total of 1 acre of total permanent and temporary impacts to wetlands permitted under the MDSPGP-3.

29.     The Woodmore Towne Center, as currently approved, will permanently impact 33,407 square feet of forested nontidal wetlands, will temporarily impact 1,350 square feet of nontidal wetlands, will permanently impact 3,660 square feet of existing streams, and will temporarily impact 845 square feet of existing streams.  In total, the Woodmore Towne Center project will impact 39,262 square feet of waters of the United States.

30.     The proposed extension of Ruby Lockhart Boulevard includes a major stream crossing that will cause a majority of the wetlands impacts from the proposed project.  Despite evidence of reasonable and feasible alternatives, the current "preferred" route of this road would impact 31,622 square feet of wetlands on the Subject Property.

31.     In June 2009, the United States Army Corps of Engineers ("Corps") issued several significant comments regarding the Application, and urged that the Application not be approved until these comments were addressed.  Specifically, the Corps questioned why certain decisions were made regarding road alignment, sewer placement, and stormwater management on the Subject Property when the alternatives would greatly reduce impacts to wetlands and surrounding wetlands buffers and streams.  At this time, the Applicant has not taken any significant or meaningful steps to address these comments.

32.     An overwhelming majority of the wetlands impacts from the Woodmore Towne Center project will occur in the Western Branch Watershed (also referred to as the Patuxent

Watershed) in Prince George's County, Maryland. Specifically, the proposed development will permanently impact 32,567 square feet of wetlands in the Western Branch Watershed and will permanently impact only 840 square feet of wetlands in the Anacostia Watershed. All 3,660 square feet of permanent stream impacts will also occur in the Western Branch Watershed.

33. As noted above, a majority of the wetlands impacts approved by the Corps and MDE in this case will occur in the Western Branch Watershed, and a small portion of impacts will also occur in the Anacostia Watershed. The 1998 Maryland Unified Watershed Assessment Report, produced by the State's Clean Water Action Plan Technical Workgroup, indicated that the Western Branch Watershed is a "priority" watershed in need of restoration and protection. As of 2003, Prince George's County and the City of Bowie, Maryland were receiving Federal grant funding to prepare a Watershed Restoration Action Strategy (WRAS) for the Western Branch Watershed. The Anacostia Watershed is one of EPA's "targeted watersheds," and has been the focus of numerous federal and state programs aimed at restoration and protection of the watershed.

34. As part of the mitigation plan for this project, the Applicant has agreed to restore an eroding stream channel off-site at the Cheverly East Neighborhood Park. This stream is located in the Anacostia Watershed. The Applicant's current plan does not call for any mitigation in the Western Branch Watershed, where most of the wetlands impacts will occur.

35. The Applicant has also entered into an agreement to purchase 2.5 acres of compensatory wetland mitigation credit from the Bri-En-Co Port Tobacco Consolidated

Mitigation Site.  This mitigation site is located in Charles County, approximately 40 miles from the proposed development.

36.     The Woodmore Towne Center project qualifies as a Category III project under the MDSPGP-3 because of its significant impact to waters of the United States.

37.     On March 01, 2010, the Corps approved the Application, and verified that the project met the conditions of the MDSPGP-3 permit.  The Corps' permit number for the project is 2007-1432.

38.     MDE allowed the Petitioner Patuxent Riverkeeper to submit comments on the Application on March 17, 2010.

39.     MDE approved the Application and issued the Permit in this case on March 19, 2010.  MDE's tracking number for the Application is 07-NT-0153/200762169.

## COUNT I

### THE CORPS FAILED TO ARTICULATE AND EXPLAIN HOW IT CONCLUDED THAT THE PROJECT WILL HAVE MINIMAL ADVERSE ENVIRONMENTAL IMPACT

40.     Plaintiff incorporates by reference each of the factual allegations set forth above.

41.     The CWA authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue general permits only if "the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e).

42.     The MDSPGP-3 states that "[p]rojects authorized by the MDSPGP-3 shall have no more than minimal individual and cumulative adverse environmental effects." MDSPGP-3 at 39.

43.     In the context of verifying a project under a Maryland SPGP permit, the United States District Court for the District of Maryland has stated that the Corps "does need to provide a unitary document, identified as the decision of the Corps, which includes at least a semblance of findings of fact and law and a statement of the reasons for the decision." *Md. Native Plant Soc'y v. U.S. Army Corps of Engineers*, 332 F.Supp. 845, 857 (D. MD. 2004).

44.     The Corps' verification letter to the Applicant and to MDE states conclusively, with no further elaboration:

> The U.S. Army Corps of Engineers, Baltimore District, has determined that the proposed work meets the terms and conditions of the Maryland State Programmatic General Permit-3 (MDSPGP-3), as a Category III activity, provided the work described above is completed in compliance with the plan(s), and the standard MDSPGP-3 conditions, which are enclosed as part of the Maryland Department of the Environment (MDE) and Corps authorization package, and any special conditions stated below.

*See* Corps' Verification Letter, attached as Exhibit A.

45.     The Corps does not provide any explanation for how it reached the conclusion that the Woodmore Towne Center project will have only minimal adverse environmental impacts, despite the fact the project will disturb just under the maximum 1 acre amount of wetlands allowed under the MDSPGP-3 permit.  Moreover, this project will cause significant wetland damage in the Western Branch and Anacostia Watersheds, two Maryland watersheds

that have been the focus of extensive recovery and conservation programs aimed at addressing specific environmental concerns in each area.

46.     The Corps' failure to provide adequate explanation for its determination that the Woodmore Towne Center will have only minimal adverse environmental impacts leads to an MDSPGP-3 verification in this case that is arbitrary and capricious, an abuse of discretion, and not in accordance with the applicable law.

## COUNT II

### THE CORPS FAILED TO ARTICULATE AND EXPLAIN HOW IT CONCLUDED THAT THE APPLICANT HAD AVOIDED AND MINIMIZED IMPACTS TO WETLANDS TO THE MAXIMUM EXTENT PRACTICABLE

47.     Plaintiff incorporates by reference each of the factual allegations set forth above.

48.     The CWA authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue general permits only if "the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e).

49.     Section VI of the MDSPGP-3 includes a subsection titled "Minimization of Environmental Impacts," which states that "[d]ischarges of dredged or fill material into waters of the United States and adverse impacts of such discharges on the aquatic ecosystem shall be avoided and minimized to the maximum extent practicable onsite."  MDSPGP-3 at 42.

50.     In this case, the Applicant performed an Alternative Site Analysis and submitted the analysis to MDE on February 5, 2009, almost two years after the initial Application was submitted.  This Alternative Site Analysis indicates that there are several potential alternative

locations for the Woodmore Towne Center, which would result in fewer impacts to wetlands than the current Subject Property.

51.     Alternative designs for elements of the project also exist.  The proposed extension of Ruby Lockhart Boulevard includes a major stream crossing that will cause a majority of the wetlands impacts from the proposed project.  Despite evidence of reasonable and feasible alternatives, the current "preferred" route of this road would impact 31,622 square feet of wetlands on the Subject Property.

52.     In an Alternatives Analysis for the stream crossing, the Applicant indicates that several alternative alignments are possible for the proposed extension of Ruby Lockhart Boulevard.  In fact, Alternative #1 would swing the proposed road westward in such a way that the stream crossing would result in zero square feet of wetlands impacts.

53.     The Corps issued comments to the Applicant and to MDE during the review period for the Application, and regarding the Ruby Lockhart Boulevard stream crossing, the Corps stated that "[a]pplicant should relocate the crossing to the west portion of the stream where the stream and wetland width is very narrow."

54.     Current utilities and stormwater management plans for the project also have alternatives that would result in lesser impacts to wetlands on the Subject Property than the current approved plans.

55.     Regarding utilities, during the review period for the Application, the Corps issued comments that recommended several possible alternatives to the current plans such as "[r]ecommend avoidance by moving utility away from wetland buffer" and "[r]ecommend sewer

crossing at or near road crossing to minimize separate disturbances of floodplain and wetland systems."

56.     Regarding stormwater management, the Corps commented, "[l]ocate sediment traps outside of wetland and buffers" and "[l]ocate SWM pond and riprap outside of stream, wetland, and buffer limits" and "[s]ediment control does not need to be located in resource areas to perform this function."

57.     Comments solicited by the Corps from the various environmental agencies during the review period of the Application indicate explicitly that "[a]pplicant should explore further avoidance and, minimization on-site.  Impacts appear to be avoidable or can be greatly reduced in scope. *We recommend that this permit application not be approved as proposed*."

58.     In response to the comments issued by the Corps and received by the various agencies during the review period, the Applicant made only minimal revisions to the design and scope of the project, and did not address the major impacts caused by the project.

59.     In the context of verifying a project under a Maryland SPGP permit, the United States District Court for the District of Maryland has stated that the Corps "does need to provide a unitary document, identified as the decision of the Corps, which includes at least a semblance of findings of fact and law and a statement of the reasons for the decision."  *Md. Native Plant Soc'y v. U.S. Army Corps of Engineers*, 332 F.Supp. 845, 857 (D. MD. 2004).

60.     The Corps' verification letter to the Applicant and to MDE states conclusively and with no further elaboration:

> The U.S. Army Corps of Engineers, Baltimore District, has determined that the proposed work meets the terms and conditions of the Maryland State Programmatic General Permit-3 (MDSPGP-3), as a Category III activity, provided the work described above is completed in compliance with the plan(s), and the standard MDSPGP-3 conditions, which are enclosed as part of the Maryland Department of the Environment (MDE) and Corps authorization package, and any special conditions stated below.

*See* Corps' Verification Letter, attached as Exhibit A.

61.     Despite the Applicant's refusal to adequately address the Corps comments, the Corps does not articulate the reasons, and does not provide any explanation for how it reached the conclusion that impacts to wetlands caused by the Woodmore Towne Center project have been avoided and minimized to the maximum extent practicable onsite.

62.     The Corps' failure to provide adequate explanation for its determination that the Woodmore Towne Center project's impacts on wetlands have been avoided and minimized to the maximum extent practicable onsite leads to an MDSPGP-3 verification in this case that is arbitrary and capricious, an abuse of discretion, and not in accordance with the applicable law.

## COUNT III

### THE CORPS FAILED TO ARTICULATE AND EXPLAIN HOW IT CONCLUDED THAT THE APPLICANT'S COMPENSATORY MITIGATION PLANS SATISFIED THE REQUIREMENTS OF THE APPLICABLE REGULATIONS AND GUIDELINES

63.     Plaintiff incorporates by reference each of the factual allegations set forth above.

64.     The CWA authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue general permits only if "the activities in such category are similar in nature,

will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e).

65.     Section VI of the MDSPGP-3 includes a provision for mitigation, and states that "[g]enerally, compensatory mitigation will be required for all permanent tidal or nontidal wetland impacts either through the State's tidal or nontidal wetland compensation fund or by the permittee as required by special condition of the MDSPGP-3 or the State authorization." MDSPGP-3 at 42.

66.     The Corps' regulatory guidance explains that mitigation should generally be located in the same watershed as the impacts to waters of the United States:

> In general, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses.

33 C.F.R. § 332.3(b)(1).

67.     The Corps' Regulatory Guidance Letter 02-02, which is applicable to the Applicant's project since it was submitted in 2007, before the new 2008 guidelines went into effect, further states that the Corps prefers mitigation projects to be located on-site with the proposed project, but if they must be off-site,  then they should be located either in the same watershed, or in close geographical proximity to the project's proposed impacts to waters of the United States:

> Mitigation should be required, when practicable, in areas adjacent or contiguous to the discharge site (on-site compensatory mitigation).  On-site mitigation generally compensates for locally important functions, e.g., local flood control functions or unusual wildlife habitat.  However, off-site mitigation may be used when there is no practicable opportunity for on-site mitigation, or when off-site mitigation provides more watershed benefit than on-site mitigation, e.g., is of greater ecological importance to the region of impact.  Off-site mitigation will be in the same geographic area, i.e., in close proximity to the authorized impacts and, to the extent practicable, in the same watershed.  In choosing between on-site or off-site compensatory mitigation, Districts will consider: 1) likelihood for success; 2) ecological sustainability; 3) practicability of long-term monitoring and maintenance or operation and maintenance; and, 4) relative costs of mitigation alternatives.

Corps of Engineers RGL 02-2, December 24, 2002 at 5.

68.     For projects that include impacts on wetlands, the Corps' Regulatory Guidance Letter 02-02 states that the agency prefers in-kind mitigation rather than out-of-kind mitigation, and that "[i]n-kind replacement for a wetland loss involves a replacement of a wetland area by establishing, restoring, enhancing, or protecting and maintaining a wetland area of the same physical and functional type.  In-kind replacement generally is required when the impacted resource is locally important." *Id.*

69.     An overwhelming majority of the wetlands impacts from the Woodmore Towne Center project will occur in the Western Branch Watershed in Prince George's County, Maryland.  Specifically, the proposed development will permanently impact 32,567 square feet of wetlands in the Western Branch Watershed and will permanently impact only 840 square feet of wetlands in the Anacostia Watershed.  All 3,660 square feet of permanent stream impacts will also occur in the Western Branch Watershed.

70.     As part of the mitigation plan for this project, the Applicant has agreed to restore an eroding stream channel off-site at the Cheverly East Neighborhood Park.  This stream is located in the Anacostia Watershed.  The Applicant's current plan does not call for any mitigation in the Western Branch Watershed, where most of the wetlands impacts will occur.

71.     The Applicant has also entered into an agreement to purchase 2.5 acres of compensatory wetland mitigation credit from the Bri-En-Co Port Tobacco Consolidated Mitigation Site.  This mitigation site is located in Charles County, approximately 40 miles from the proposed development.

72.     During the review period for the Application, the record indicates that the Corps and the EPA expressed concern that the Applicant's mitigation projects were located far off-site from the Subject Property, and not in close proximity to where the impacts to wetlands will occur.

73.     In the context of verifying a project under a Maryland SPGP permit, the United States District Court for the District of Maryland has stated that the Corps "does need to provide a unitary document, identified as the decision of the Corps, which includes at least a semblance of findings of fact and law and a statement of the reasons for the decision."  *Md. Native Plant Soc'y v. U.S. Army Corps of Engineers*, 332 F.Supp. 845, 857 (D. MD. 2004).

74.     The Corps' verification letter to the Applicant and to MDE states conclusively and with no further elaboration:

> The U.S. Army Corps of Engineers, Baltimore District, has determined that the proposed work meets the terms and conditions of the Maryland State Programmatic General Permit-3 (MDSPGP-3), as a Category III

> activity, provided the work described above is completed in compliance
> with the plan(s), and the standard MDSPGP-3 conditions, which are
> enclosed as part of the Maryland Department of the Environment (MDE)
> and Corps authorization package, and any special conditions stated below.

*See* Corps' Verification Letter, attached as Exhibit A.

75.     Despite the fact that the Applicant's mitigation projects are off-site, located in different watersheds than where the majority of wetlands impacts will occur, and in one case even located 40 miles from the Subject Property in an entirely different County, the Corps does not articulate the reasons, and does not provide any explanation for how it reached the conclusion that the Applicant's required compensatory mitigation plans satisfied the requirements of the CWA, its implementing guidelines, and the Corps' own regulatory guidance criteria for compensatory mitigation projects.

76.     The Corps' failure to provide adequate explanation for its determination that the Applicant's compensatory mitigation plans satisfies the requirements of the CWA, its implementing guidelines, and the Corps' criteria for compensatory mitigation projects leads to an MDSPGP-3 verification in this case that is arbitrary and capricious, an abuse of discretion, and not in accordance with the applicable law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Riverkeeper respectfully requests this Court to grant the following relief:

77.    Declare that the Corps' decision to authorize the Woodmore Towne Center project under the MDSPGP-3 permit was arbitrary and capricious, an abuse of discretion, and not in accordance with the applicable law.

78.    Enjoin the Corps from authorizing the Woodmore Towne Center project until it has complied with all provisions of the CWA and its implementing guidelines, as well as the provisions of the MDSPGP-3 permit.

79.    Any other relief that the Court may deem proper.


Respectfully Submitted,


_____/s/_____
G. Macy Nelson (#02993)
Suite 803
401 Washington Avenue
Towson, Maryland 21204
Telephone: (410) 296-8166
Facsimile: (410) 825-0670
gmacynelson@gmacynelson.com
Attorney for Plaintiff