IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| EARTHREPORTS, INC d/b/a THE PATUXENT RIVERKEEPER, Plaintiff, v. THE UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*, Defendants. | * * * * * * * * * * * * | Civil Action No. 8:10-cv-01834-AW |

**********************************************************************

## MEMORANDUM OPINION

Pending before the Court is Defendant Woodmore Towne Centre LLC ("Woodmore" or "Petrie/ELG")'s[1] motion for summary judgment based on lack of standing. *See* Doc. No. 23.[2] The Court has reviewed the motion papers submitted by the Parties and on September 23, 2011, held an evidentiary hearing on the issue of standing. For the reasons articulated below, the Court will grant Defendant's motion.

## I.      FACTUAL & PROCEDURAL BACKGROUND

The Woodmore Towne Centre is a 244.67 acre development in Prince George's County, Maryland. As part of the centre's development, Defendant applied to the Maryland Department of the Environment ("MDE") for a permit to extend Ruby Lockhart Boulevard, which serves as the primary access road to the centre.  Prior to MDE issuing the permit, the United States Army

---

[1]Petrie/ELG Inglewood LLC, a Delaware Limited Liability Company, is now known as Woodmore Towne Centre LLC, also a Delaware Limited Liability Company, by virtue of a name change filed in Delaware in September, 2010 and in Maryland in October, 2010. Doc. No. 23 at 1 n.1.

[2]The Court converted Defendant's original motion to dismiss for lack of standing and lack of capacity to sue into a motion for summary judgment. *See* Doc. No. 30.

Corps of Engineers ("Corps") verified that the development complied with the Maryland State Programmatic General Permit-3 (MDSPGP-3) requirements. The permit authorized the road extension, including the installation of four box culverts to cross a stream. The stream is the north fork of the Southwest Branch of the Patuxent River, which connects with the Western Branch of the Patuxent River approximately five miles downstream of the development. The permit also authorized permanent impacts to 33,407 square feet of forested nontidal wetlands and 3,660 square feet of existing streams, as well as temporary impacts to 1,350 square feet of nontidal wetlands and 845 square feet of existing streams. The majority of the permanent impacts, 32,567 square feet of wetlands and 3,660 square feet of streams, occur in the Western Branch watershed. At the time EarthReports, Inc. d/b/a The Patuxent Riverkeeper ("Plaintiff") filed its complaint, all of the work authorized by the permit had been completed.

Plaintiff's institutional mission is "to protect, restore, and advocate for clean water in the Patuxent River and its connected ecosystem." Doc. No. 24, Ex. J ¶ 4 [hereinafter Tutman Aff.]. To articulate a basis for organizational standing, Plaintiff submitted an affidavit of one of its members, David Linthicum. *See* Doc. No. 24, Ex. K ¶ 2 [hereinafter Linthicum Aff.]. Linthicum paddles and wades in the Western Branch as near as 8.5 miles from the development. *Id.* ¶ 5; Doc. No. 24, Ex. L at H-129, 142 [hereinafter Tr.]. He visits the area approximately five times a year and plans to continue to visit it every few months. Linthicum Aff. ¶ 5; Tr. at H-140-42. After the development was completed, Linthicum continued to wade and paddle in the Western Branch. Tr. at H-148. Linthicum claims that "[s]ignificant degradation of the Western Branch tributary and watershed would prevent [him] from continuing [his volunteer] work along the river, [which includes wading in the river to clear trees and other blockages], and would generally prevent [him] from enjoying the aesthetics of the river and watershed." Linthicum Aff.

¶¶ 8, 13.  He also states that "preparing and selling [his self-produced] maps and guides [of the Western Branch watershed] will become increasingly difficult if the current and future health and appearance of the Western Branch watershed and tributary is not maintained."  *Id.* ¶ 14.

Linthicum has not noticed any changes in the Western Branch since the development was completed other than those due to seasonal changes and a major storm.  Tr. at H-149-50.  However, Linthicum asserts that the permit "will cause impacts to wetlands and streams in the Western Branch watershed" that "will ultimately have a direct effect" on the area of the Western Branch that he uses.  Linthicum Aff. ¶ 7.  In explaining his allegation that the permitted development "will ultimately" affect the area he uses, Linthicum states that he is referring to a cumulative effect and that "what happens 10, 20, 100 miles up river effects the down river."  Tr. at H-152.  He indicates that stormwater runoff from the development's impervious surfaces and the loss of wetlands, which absorb toxins from runoff, will degrade the water quality of downstream areas.  Linthicum Aff. ¶¶ 9, 10.  Linthicum also contends that the loss of wetlands "eventually leads to the death and desertification of a river's tributaries and takes an equivalent toll on the waters of the main channel."  *Id.* ¶ 10.  In regard to the affected streams, Linthicum contends that diverting and/or compromising them "can affect the flow rate and the ecology of the tributaries of the Patuxent River."  *Id.* ¶ 9.

As support for these statements, Linthicum refers to scientific articles connecting the impacts of urbanization on headwaters and streams to deleterious effects on downstream rivers and watersheds.  *Id.* ¶ 11; Tr. at H-152, 159, 180-81.  He also cites articles for the proposition that upstream waters deliver nitrogen and other pollutants to downstream waters.  Linthicum Aff. ¶ 11.  Finally, Linthicum explains the impacts of the culverts by quoting an article that states "[i]ncreased flow rates through culverts can be a major impediment to wetland functioning as

well as fish migration." *Id.* ¶ 12.  In his testimony, Linthicum refers to studies and personal observations of other rivers for his assertion that the percentage of impervious surfaces affects downstream areas.  Tr. at H-180-81.  He also notes that he has observed an increase in impervious surfaces in Google Earth.  *Id.* at H-181.  In addition, Linthicum asserts that culverts lead to an increased speed of runoff, silt, and sedimentation, which he has personally witnessed in the past.  *Id.* at H-182.

In regard to how he learned of the permit's alleged impacts, Linthicum states that Plaintiff's CEO explained the wetland and stream impacts and identified their location on imagery and maps.  Tr. at H-155, 159.  In regard to his claim that the permitted activity would lead to desertification of wetlands, Linthicum admits that he does not have any specific facts that would lead him to believe that desertification would occur as a result of this project; rather, he is concerned with the prospect of "death by a thousand cuts."  Tr. at H-166.

Defendant asserts that Linthicum "has no idea whether or not stormwater management activities would in any way degrade the water quality of the Western Branch or the Patuxent River."  Doc. No. 32 at 17 (citing Tr. at H-159-l62).  In addition, Defendant claims that Linthicum "is aware of no facts which support a conclusion that actions taken by [Defendant] as a result of the Corps' verification or the MDE Permit will increase flow rates, or channelization, or destroy the effectiveness of the wetland areas within Woodmore Towne Centre."  *Id.* at 18 (citing Tr. at H-161, 163-177).

On July 7, 2010, Plaintiff filed a complaint in this Court against the United States Army Corps of Engineers; Robert L, Antwerp, Lieutenant General, in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; John McHugh, in his official capacity as Secretary of the Army; the Environmental Protection

Agency; and Lisa Jackson in her capacity as Administrator of the EPA.  Plaintiff seeks an

injunction and a declaration that the Corps' verification that the Woodmore Towne Centre

development complied with the MDSPGP-3 requirements was arbitrary and capricious.

On November 16, 2010, the Court granted Defendant Woodmore Towne Centre LLC's

motion to intervene.  *See* Doc. Nos. 14, 18.  Defendant subsequently filed a motion to dismiss for

lack of standing and lack of capacity to sue on December 15, 2010.  *See* Doc. No. 23.  On

January 18, 2011, the Court granted in part and denied in part Defendant's motion, substituting

"EarthReports, Inc. d/b/a The Patuxent Riverkeeper" in place of "The Patuxent Riverkeeper" as

Plaintiff, and converting the remainder of the motion into a motion for summary judgment with

respect to Article III standing.  *See* Doc. No. 30.

Prior to initiating the current suit, Plaintiff challenged the MDE's decision to issue a state

permit for the Woodmore Towne Centre development in the Circuit Court for Prince George's

County.  On December 1, 2010, the court dismissed the case for lack of standing, finding that

Plaintiff had not established a sufficient injury in fact.[3]  *See id.*  The affidavits and transcript

from the court's proceedings have been introduced as evidence in this case.  *See* Tutman Aff.;

Linthicum Aff.; Tr.


II.     **STANDARD OF REVIEW**

Summary judgment is only appropriate if "there is no genuine issue as to any material

fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c);

*see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The Court must "draw all justifiable

inferences in favor of the nonmoving party, including questions of credibility and of the weight

---

[3] As required by Maryland law, the court applied the federal standing requirements.  *See* MD. CODE ANN., ENVIR., § 5-204(f)(i) (West 2011).

to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Nevertheless, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

To demonstrate standing in response to a summary judgment motion, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' which for the purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)). If, after a plaintiff provides evidence to support his/her allegations, the defendant fails to rebut the allegations, "the case proceeds to trial on the merits, where the plaintiff must prove the allegations in order to prevail." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987). However, "the Constitution does not require that the plaintiff offer this proof as a threshold matter in order to invoke the District Court's jurisdiction." *Id.* Thus, although standing is usually resolved prior to trial, a court may find it necessary to wait to determine whether the factual allegations are "supported adequately by evidence adduced at trial." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979); *see also Munoz-Mendoza v. Pierce*, 711 F.2d 421, 425 (1st Cir. 1983) ("The court must resolve any genuine disputed factual issue concerning standing, either through a pretrial evidentiary proceeding or at trial itself.")

## III.     ANALYSIS

The Supreme Court has held that "[a]n association has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000). To prove the first element, the association must show that the member "(1) [] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 180-81.

A.       <u>Organizational Standing</u>

The Court must determine whether Plaintiff has standing to bring suit on behalf of Linthicum, its member. Plaintiff has established that the interests at stake in this matter are germane to the organization's purpose. Plaintiff's purpose is "to protect, restore, and advocate for clean water in the Patuxent River and its connected ecosystem." Tutman Aff. ¶ 4. Because Linthicum has recreational and aesthetic interests in the health of the Western Branch, which is part of the Patuxent River ecosystem, this element is met. Also, the Court finds that neither the claim asserted nor the relief requested would require Linthicum to participate in this lawsuit. Thus, the crucial question remaining is whether Linthicum has standing to sue in his own right.

1.       Injury in Fact

In the context of environmental cases, the Supreme Court has held that plaintiffs "adequately allege injury in fact when they aver that they use the affected area and are persons

'for whom the aesthetic and recreational values of the area will be lessened' by the challenged

activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

First, to establish that the injury is concrete and particularized, a plaintiff must show that

the injury affects him/her "'in a personal and individual way.'" *Friends of the Earth, Inc. v.*

*Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) [hereinafter *Gaston Copper*

*I*] (quoting *Defenders of Wildlife*, 504 U.S. at 560 n.1).  When the injury is related to the use of

an area, a plaintiff must show that (s)he uses the specific area affected by the challenged activity

and not "'an area roughly in the vicinity of'" the affected area.  *Summers v. Earth Island Inst.*,

129 S. Ct. 1142, 1150 (2009) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886-87, 889

(1990)).

The second element of injury in fact is that a plaintiff must assert an actual injury or an

imminent future or threatened injury.  *See Valley Forge Christian Coll. v. Ams. United for*

*Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  To establish an imminent

threatened or future injury to his/her use of an area, a plaintiff must assert concrete plans to use

the area rather than a vague, "'some day'" desire to use the area.  *Summers*, 129 S. Ct. at 1150-51

(quoting *Defenders of Wildlife*, 504 U.S. at 564).

In this case, David Linthicum, a member of Plaintiff's organization, avers that he uses the

Western Branch. Specifically, Linthicum states that about five times a year, he paddles on the

Western Branch as near as 8.5 miles "as the crow flies" from the Woodmore Towne Centre, and

that he plans to continue to visit the area every few months. As suggested by the Supreme Court

and Fourth Circuit, the distance of the area Mr. Linthicum uses from the location of the

challenged activity is not determinative of injury in fact.[4]  Rather, the relevant inquiry is whether

---

[4]In *Laidlaw*, the Supreme Court found that a Sierra Club member had established injury in fact because the member
"had canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe . . . closer to

the area Linthicum uses, and his interests in that area, will be affected by the challenged activity, *i.e.*, issuance of the permit.

Linthicum contends that the impacts authorized by the permit threaten his interests because they will potentially reduce his ability to wade in the water, to clear trees and other blockage, to enjoy the river's aesthetics, and to prepare and sell his maps. He claims that the impacts to the stream and wetlands authorized by the permit will degrade the water quality and ecology of the Western Branch and cause future injuries to his interests in using the area.

However, Linthicum has not stated any facts or evidence, either in his affidavit or at the evidentiary hearing, supporting his contention that an imminent or future injury is likely to in fact occur. Linthicum is clear to point out that he is not a scientist and that his fears of environmental degradation stem only from: (1) his personal observations of the Anacostia River and other rivers that have experienced environmental degradation over the last 20-to-25 years; and (2) articles he has read about the downstream environmental impacts caused by upstream urbanization.

At the evidentiary hearing held on September 23, 2011, Defendant countered Linthicum's statements about possible downstream injury with facts specifically relating to the Woodmore Towne Centre development. Defendant presented the testimony of Terry Richardson, a principal with Petrie/ELG[5] and heavily involved in the decision to develop in the Woodmore Towne Centre project. Richardson established that numerous county and state bodies, as well as the U.S. Army Corps of Engineers, reviewed the site plans, held hearings, and considered the issues

---

Laidlaw's discharge point, but did not do so because he was concerned that the water contained harmful pollutants." 528 U.S. at 183.  Similarly, the Fourth Circuit recognized injury in fact for individuals who canoed 16.5 and 14 miles downstream from discharge points because the polluted discharge would have reached those areas.  *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 397 (4th Cir. 2011) [hereinafter *Gaston Copper II*]; *Am. Canoe*, 326 F.3d at 510, 518.

[5]Now known as Woodmore Towne Centre LLC. Doc. No. 23 at 1 n.1.

raised by Plaintiff in its opposition. Environmental concerns were thoroughly discussed. In fact, the Environmental Planning Section initially had significant qualms about the culverts to be built over the stream at issue. Focused on minimizing environmental impact, the parties made a series of adjustments of the original culvert design, resulting in a final design that Wetlands Ecology expert George Junkin testified is as protective of stream wildlife and plant life as a bridge would be.

Specifically, the parties agreed to build culverts containing a natural, "earth-lining" soil floor which allows the water channel to flow naturally. Vertical retaining walls replaced "wing walls" to further decrease impact.  Junkin, whom the Court qualified as an expert in wetlands ecology, represented Petrie/ELG in providing environmental engineering and planning services in conjunction with the development of Woodmore Towne Centre. He supervised all the work undertaken by his company at the Centre and is personally familiar with the project. Junkin testified that he has visited the actual site of the culverts many times, including the week of the evidentiary hearing, and that he has never observed abnormal changes, damages, run-off, obstruction of flow, channelization, or alteration of hydrology. Junkin testified that the articles Linthicum read and testified to, regarding impervious surfaces and channelizing of flow, have no relevance to a project of this nature. Although Junkin acknowledges that the actual point of impact at which the culvert was built is clearly affected, he testified that the culvert was "over-engineered" and made extra-large to accommodate a relatively small stream, and that as a result there will be "absolutely no impact" downstream.

Given the general and speculative nature of Linthicum's testimony, the Court finds that Plaintiff has failed to set forth "specific facts" as necessary to support a showing of injury-in-fact. *See Lujan*, 504 U.S. at 561. At best, Plaintiff has established that Linthicum has strong

recreational and aesthetic interests in the Patuxent River and that Linthicum truly believes that

the Woodmore Towne Centre developments will affect his activities. However, Defendant has

demonstrated sufficient facts to squarely rebut any allegations that any injury will in fact occur.

In sum, Plaintiff has failed to show an injury in fact where there is no evidence supporting

downstream harm and Linthicum does not utilize the area of direct impact.


       2.     Traceability

Standing requires "a causal connection between the injury and the conduct complained

of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not .

. . th[e] result [of] the independent action of some third party not before the court.'" *Defenders of*

*Wildlife*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42

(1976)).  Traceability, however, does not require the defendant to be the only party responsible

for the injury, or the party that contributes most significantly to the injury. *See Massachusetts*,

549 U.S. at 523-24 (rejecting the argument that insignificant contributions to injuries should not

support standing); *Am. Canoe*, 326 F.3d at 520 (finding traceability even though independent

third parties could have contributed to the plaintiffs' injuries).

In some past cases, the Supreme Court has found standing even if an injury is indirect

and has an attenuated line of causation.  *See, e.g., SCRAP*, 412 U.S at 688 (recognizing an injury

to plaintiffs who alleged that an increased railroad freight rate would lead to the increased use of

natural resources and disposal of refuse in national parks).  However, the Court later clarified

that speculative inferences are not enough to establish traceability.  *See Simon.*, 426 U.S. at 45-

46, 46 n.25 (finding no standing when traceability required speculative inferences and depended

on "unalleged and unknown facts").  The Fourth Circuit has stated that a plaintiff does not need

to prove traceability with scientific certainty; rather, a plaintiff "'must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern." *Gaston Copper I*, 204 F.3d at 161 (quoting *Natural Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992)); *see also id.* (noting that other circuits have not interpreted the fairly traceable standard to be "equivalent to a requirement of tort causation").

Although certainty is not required, the Fourth Circuit has stressed the importance of a plaintiff's evidence for establishing traceability. *See Gaston Copper I*, 204 F.3d at 161-62 (pollution of the type discharged by the facility previously found in the area, facility discharging pollutants that cause environmental degradation, and discharge would reach the area used by the plaintiff); *see Am. Canoe*, 326 F.3d at 520 (plaintiffs were in the geographic area of concern and discharge was capable of causing the kinds of injuries complained of). The Fourth Circuit has also indicated that there is a distinction between plaintiffs within a discharge zone and "those who are so far downstream that their injuries cannot fairly be traced to that defendant." *Gaston Copper I*, 204 F.3d at 162 (citing *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 385, 361-362 (5th Cir. 1996)). For downstream injuries, traceability cannot be established by stating "that's the way water runs;" rather, a plaintiff must provide some proof that the activity "contributes to a perceivable effect" in the downstream area used by the plaintiff. *Crown Central*, 95 F.3d at 361-62.

Linthicum alleges that the verification of the permit by the Army Corps will cause environmental impacts that will injure his downstream use of the Western Branch. As discussed above, Linthicum contends that the culverts will cause increased impervious surfaces, loss of wetlands, stream flow alterations, and will degrade the water quality and ecology of downstream

areas.  As support for his claims, Linthicum refers to his personal knowledge and scientific articles.  Regarding personal knowledge, Linthicum states that he has witnessed an increase in silt and sedimentation build up as a result of culverts before. The scientific articles cited by Linthicum connect upstream urbanization generally to downstream impacts.

Based on the lack of evidence connecting the permit in this case to negative present or future downstream environmental impacts, and the extensive evidence presented by Defendant that such impacts will not occur, Plaintiff has failed to show that Defendant's activities are capable of causing the claimed injuries.  Plaintiff has not provided much beyond Linthicum's assertion that "what happens 10, 20, 100 miles up river effects the down river." Tr. at H-152. Because Linthicum cannot establish a causal connection between the verification of the permit and his potential future injuries, Plaintiff has not satisfied the traceability requirement.

3.      Redressability

To satisfy the standing requirements, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Laidlaw*, 528 U.S. at 181.  "'[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will relieve his *every* injury.'"  *Massachusetts*, 549 U.S. at 525 (quoting *Larson v. Valente,* 456 U.S. 228, 244, n. 15 (1982)).  Because Plaintiff has not established an injury in fact in this case, it follows that there is nothing for the Court to redress.

IV.    **CONCLUSION**

The Court finds that no genuine issue of material fact exists regarding whether Linthicum has suffered an injury that is "fairly traceable" to the challenged action.  Plaintiff had the burden

of proving standing and has failed to produce sufficient facts to support its position.  For these reasons, Defendant's motion for summary judgment for lack of standing is granted.  A separate order will follow memorializing the decisions rendered in this opinion.

| | |
|---|---|
|     September 26, 2011     |           /s/           |
| Date | Alexander Williams, Jr. |
| | United States District Judge |